Filed 6/26/14  Sarnecky v. Barratt Developments CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JAMES SARNECKY et al., | D063848 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2010-00092634-CU-OR-CTL) |
| BARRATT DEVELOPMENTS, PLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Luis R. Vargas and Joan M. Lewis, Judges.  Affirmed.

Aguirre, Morris & Severson, Michael J. Aguirre, Christopher S. Morris and Maria C. Severson for Plaintiffs and Appellants.

Chapin Fitzgerald Sullivan & Bottini, Kenneth M. Fitzgerald and Keith M. Cochran for Defendant and Appellant Barratt Developments, PLC.

# I.

## INTRODUCTION

Plaintiff James Sarnecky, together with a putative class of other homeowners in the Seahaus La Jolla condominium project (the Seahaus project), appeal from a judgment in favor of defendant Barratt Developments, PLC (Barratt), a British homebuilding company, after the trial court sustained Barratt's demurrer to the plaintiffs' sixth amended complaint (6AC).

The putative class action seeks redress over the allegedly fraudulent marketing and sale of condominiums that the plaintiffs claim were defectively constructed. The plaintiffs also named the developer, architect, general contractor, engineer, framing beam supplier, and numerous lenders who financed mortgages used to purchase the allegedly defective units, in the 6AC. The main thrust of the 6AC is that the defendants defrauded the plaintiffs into purchasing condominium units at prices that exceeded the true value of the units, and that the true value of the units was substantially less than the price the plaintiffs paid due to poor construction practices and defects in the resulting construction. The 6AC alleges three causes of action against Barratt: intentional misrepresentation, negligent misrepresentation, and concealment of material facts.

Barratt is the former parent company of an American subsidiary, Barratt American, Incorporated (Barratt American), which filed for bankruptcy protection in 2008. However, Barratt sold its interest in Barratt American in August 2004. Although the 6AC makes certain generalized allegations that some of the misrepresentations

2

occurred prior to August 2004, when Barratt was still involved in the Seahaus project through Barratt American, other, more specific allegations of the complaint demonstrate that virtually all of the conduct about which the plaintiffs are complaining appears to have occurred *after* August 2004. In fact, some allegations of the complaint assert that the conspiracy to misrepresent and conceal material facts did not commence until March 2005.

The trial court concluded that the allegations against Barratt pertained to events that occurred after Barratt had sold its interest in Barratt American, and, on this basis, concluded that the plaintiffs could not state a claim against Barratt, even under an alter ego theory with respect to Barratt American. The trial court therefore sustained Barratt's demurrer without granting the plaintiffs leave to amend. The court ruled on the demurrer after hearing oral argument from Barratt only, due to a calendaring error by plaintiffs' counsel.

On appeal, the plaintiffs contend that the trial court erred in sustaining Barratt's demurrer. The plaintiffs also contend that they are entitled to mandatory relief from the dismissal pursuant to Code of Civil Procedure[1] section 473, subdivision (b), because their counsel did not have the opportunity to orally oppose the demurrer due to having miscalendared the time of the hearing.

---

[1]    Statutory references are to the Code of Civil Procedure, unless otherwise specified.

3

Barratt cross-appeals from the trial court's order denying its request for sanctions for having to oppose a motion for reconsideration filed by the plaintiffs.

After reviewing the allegations of the complaint *de novo* and considering the parties' arguments on appeal, we conclude that the trial court's order sustaining Barratt's demurrer without leave to amend should be affirmed. Plaintiffs have filed seven complaints in this matter. Although the plaintiffs did not name Barratt as a defendant until the fourth amended complaint, they could have done so at an earlier point in the litigation, since Barratt's relationship to Barratt American was known from the outset. Despite having had more than a year and half since the filing of their original complaint to investigate Barratt's role, if any, in the underlying events, the plaintiffs have failed to present anything more than generalized assertions that Barratt was involved in the alleged misrepresentations regarding the Seahaus project, and these assertions conflict with other portions of the 6AC.

We further conclude that the trial court did not err in denying the plaintiffs' request for relief pursuant to section 473, subdivision (b). The plaintiffs are not entitled to mandatory relief under the statute, and the trial court acted within its discretion in denying relief under the discretionary relief provision.

Finally, we conclude that the trial court did not abuse its discretion in denying Barratt's request for sanctions. We therefore affirm the judgment of the trial court.

4

II.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Barratt is a British homebuilder. In 1980, Barratt formed Barratt American to construct housing in southern California. In 2002, Barratt, through Barratt American, "initiated . . . the Seahaus La Jolla, then known as Inns at La Jolla." Barratt, through Barratt American, acquired the land and obtained construction loans to build Seahaus.

According to the 6AC, as of April 13, 2004, "[n]one of the 138 condominiums in the Seahaus La Jolla project had been built." In fact, construction plans for the project and building permits were not issued until April 9, 2004.[3]

The 6AC alleges that on five occasions prior to or during August 2004, defendants CLB Partners, Ltd., (CLB), a Texas limited partnership doing business in San Diego and a developer of the Seahaus project, as well as another defendant, Webcor Development, Inc. (Webcor), the "construction contractor," deviated from the construction plans that had been submitted to, and approved by, the City of San Diego.[4] The allegations in the

---

[2]   In accordance with the rules governing appellate review of a superior court's ruling on a demurrer, the following factual recitation is taken from the allegations of the plaintiffs' 6AC. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

[3]   According to other allegations of the 6AC, however, it appears that some construction may have begun on the project as early as January 2004. The exact date on which construction began is not clear from the 6AC.

[4]   It is not clear why the 6AC alleges that at least one deviation from the approved plans occurred prior to the date on which the plans are alleged to have been approved by the City of San Diego.

6AC include notations from and/or summaries of "field reports" and/or e-mails written by

two individuals affiliated with defendant D'Amato Conversano, Inc. (DCI), the engineer

for the project.[5]

Barratt sold Barratt American on August 30, 2004. The plaintiffs allege that prior

to the sale, Barratt "used its control of Barratt American to carry out its plan to withdraw

and divert $23 million from the Seahaus La Jolla Guaranty Bank construction loan." As

---

[5]     The alleged "Plan Deviation[s]" identified in the 6AC arising from these field reports that include dates prior to or during August 2004 are items such as the following: (a) on January 25, 2004, in a memo from someone at DCI to an unknown recipient: "Building E the 91/2 TJI/10 floor joists were installed at 16 [inches] on center instead of the 12 [inches] on center specified on the structural drawings and the joist ship drawings"; (b) on June 2, 2004, in an e-mail from someone at DCI to someone else at DCI: "Building K no anchor bolts placed in slab. 'Webcor has been getting into the habit of just guessing where things go instead of asking for clarifications or direction or looking at the details' "; (c) on June 2, 2004, in an e-mail from someone at DCI to someone at Webcor: "I realize you guys are under a lot of pressure to get these buildings done, but it always takes longer for both you guys and DCI to try to figure out how to fix something after the fact"; (d) on July 8, 2004, in an e-mail from someone at DCI to someone at M.W. Steele: "Jason Armison (Barratt) has asked us to look into changing most of the trellises on the Seahaus project from steel to woods, because the pricing on the steel trellises came in rather high."

It is not clear whether, or how, any of these claimed "deviations" created problems with the ultimate construction. Further, at least with respect to some of these communications, it is not at all apparent whether any deviation from the plans actually occurred—for example, the allegation regarding "look[ing] into changing most of the trellises" does not state that any of the trellises were, in fact, altered from the original plans. Nor does the 6AC allege why or how such a deviation, if it occurred, was problematic. Further, other than the allegation regarding "look[ing] into changing most of the trellises," there is no allegation in the 6AC that Barratt, or Barratt American, was aware of the any of these purported deviations from the plans, or that Barratt, or Barratt American, made any false statements or material omissions with respect to these purported "deviations" from the approved plans.

alleged in the 6AC, this $23 million was part of $165 million that Barratt withdrew from Barratt American when Barratt sold its interest in the American subsidiary.[6]

The plaintiffs allege that on March 30, 2005, "a decision was made to seal up the Seahaus buildings, despite the discovery of extensive water damage to the manufactured PSL Parallam."  Plaintiffs further allege:

> "In and about March 2005, for the purpose of closing the Seahaus sales escrows and consummating sales of the Seahaus units to generate funds for themselves, defendants Webcor, through Ken Summers (Senior Project Manager) and Jeremy Bishop (Project Engineer); CLB through Luke Daniels, Seth Rhea, and Hal Adams; M.W. Steele through Mark Steele and Andrew Duncan; D'Amato Conversano through Robert Heeringa, Richard Hemmen, Diane Earnest; and Weyerhauser through Terry K. Metzker, Curt Nieman, Jim Nicodemus, and Tuong Banh, knowingly and willfully conspired and agreed to misrepresent and suppress facts needed to make those [facts that were previously] stated not misleading with the purpose of closing the escrows and consummating sales on for [*sic*] the Seahaus project.  Defendants misrepresented facts and suppressed facts with the intent to keep plaintiffs, City of San Diego building inspectors, and California Department of Real Estate enforcement agents from discovering defects and deviations from the approved plans outlined above."

In the immediately succeeding paragraph, however, the plaintiffs allege that Barratt and Barratt American agreed to "conceal the defects and shoddy construction practices," and that "[t]his agreement was made and carried out before the sale of British Barratt Developments PLC's interest in Barratt American was closed."  The 6AC

---

6    According to the 6AC, Barratt's taking of the $23 million from the construction loan was damaging to the plaintiffs because "when the defects detailed in this operative complaint were discovered there was [*sic*] insufficient funds to pay for repairs needed."

7

included no specifics as to the timing of the alleged concealments by Barratt, or the alleged agreement to conceal between Barratt and Barratt American.

Unaware of the water damage to the PSL Parallam beams, the plaintiffs closed the purchases on their condominiums between May 2005 and January 2007.

In December 2008, Barratt American filed for bankruptcy.

The plaintiffs filed their original complaint on May 21, 2010, as a putative class action. The plaintiffs contended that they brought suit "after material construction defects were discovered at [the Seahaus project] . . . ." The plaintiffs named as defendants the developers, architect, general contract, engineer, framing beam supplier, and numerous lenders who financed the mortgages that the plaintiffs used to purchase their condominium units. According to Barratt, the plaintiffs did not name Barratt as a defendant in the first four iterations of the complaint, but first amended the operative complaint to name Barratt as a defendant in their fourth amended complaint.[7]

The trial court sustained Barratt's demurrer to the fourth amended complaint.[8] However, since the plaintiffs had filed a fifth amended complaint while Barratt's demurrer to the fourth amended complaint was pending, and, given that the "allegations against Barratt PLC remain the same in the [fifth amended complaint] as those previously

[7] The plaintiffs did not name Barratt American as a defendant in their fourth amended complaint, their fifth amended complaint, or in the 6AC. According to Barratt's briefing, the plaintiffs never named Barratt American as a defendant in this litigation.

[8] The record does not reveal what happened with respect to the plaintiffs' first four complaints.

alleged in the [fourth amended complaint]," the trial court treated its ruling as applying to both the fourth amended complaint and the fifth amended complaint. The court granted the plaintiffs an opportunity to amend their pleadings.

The plaintiffs then filed the 6AC, which sets forth 11 causes of action against the various defendants. Barratt is named in only the first three causes of action. The first cause of action alleges a claim for "Fraud and Deceit: Intentional Misrepresentation of Fact." The second cause of action alleges a claim for "Fraud and Deceit: Suppression of Material Facts." The third cause of action alleges a claim for "Fraud and Deceit: Negligent Misrepresentation of Fact."

Barratt demurred to the 6AC. After briefing on the matter, on November 16, 2010, the trial court issued a tentative order proposing to overrule Barratt's demurrer. The trial court was set to hear argument from the attorneys 10 days later. However, plaintiffs' counsel apparently miscalendared the time of the hearing. Believing the hearing to be scheduled for 10:30 a.m. rather than 9:00 a.m., plaintiffs' counsel failed to appear for the hearing.[9] There was no court reporter at the hearing. The trial court heard argument from Barratt's counsel and took the matter under submission.

---

[9] The hearing had originally been set for November 16 at 10:30 a.m., but because of a scheduling conflict, the court reset the hearing for November 26 at 9:00 a.m. Upon learning of the error, and the fact that hearing had taken place without plaintiffs' counsel's participation, counsel immediately called the court to apologize.

On December 6, 2012, the trial court issued a minute order sustaining, without leave to amend, Barratt's demurrer to the first, second, and third causes of action, on the following grounds:

"The 6AC alleges Barratt PLC sold its American subsidiary, Barratt American, in August 2004. [Citation.] Thus, as alleged in the 6AC, after August 2004, Barratt PLC was no longer the parent company of Barratt American, and had divested itself of any interest in Barratt American.

"The 6AC further alleges Barratt PLC participated in a conspiracy to defraud Plaintiffs beginning in March 2005. [Citation.] The 6AC alleges no false representations made by Barratt PLC. Since Barratt PLC is alleged to have sold Barratt American in August 2004, Barratt PLC cannot be held liable under an alter ego theory for conduct alleged to have occurred after the sale. The 6AC also does not allege Barratt PLC was involved in the Seahaus project after its sale of Barratt American in August 2004.

"The twelve (12) new paragraphs alleged against Barratt PLC in the 6AC [citation] fail to cure the deficiencies noted by the court in its ruling on Barratt PLC's Demurrer to Plaintiffs' Fifth Amended Complaint. [Citation.] The 6AC alleges in conclusory terms: 1) Barratt PLC concealed defects before August 2004, even though the 6AC repeatedly alleges the conspiracy began in March 2005 [citation]; 2) Barratt PLC made unidentified misrepresentations about construction defects before August 2004 [citation]; and 3) Barratt PLC diverted $23 million of construction funds [citation].

"The 6AC fails to plead any specific facts regarding Barratt PLC's knowledge or concealment of any construction defects prior to August 2004, or any specific misrepresentations made by Barratt PLC regarding those defects. The 6AC also fails to allege Barratt PLC made misrepresentations to Plaintiffs regarding the construction loan, or that Plaintiffs were induced to purchase units based on how the project was financed. Moreover, Plaintiffs' fraud-based causes of action seek damages in the amount of the difference between the value of the units as purchased versus the units' actual value [citation]; thus, the fraud measure of damages in the 6AC is

10

unconnected to the allegations regarding the alleged diversion of construction loan proceeds.

"The 6AC fails to attribute any false statements to Barratt PLC or its alleged alter ego, Barratt American. The 6AC also fails to allege any fraudulent statements and concealments before August 2004, when Barratt PLC divested itself of ownership of Barratt American. These defects cannot be cured by further amendment."

The plaintiffs moved for reconsideration of the order pursuant to section 1008, and also sought relief from the dismissal of Barratt pursuant to section 473, subdivision (b). The trial court denied the motions, concluding that the plaintiffs had not offered any new or different facts, circumstances or law that would justify reconsideration, and concluding that the plaintiffs had not demonstrated that the order sustaining Barratt's demurrer was the result of counsel's "purported mistake, inadvertence, surprise or excusable neglect."

Barratt moved for sanctions under section 1008, subdivision (d), on the ground that the plaintiffs had failed to meet the requirements of subdivision (a) of that provision. The trial court denied Barratt's request for sanctions. The court's reasons for denying the request were not set forth in the order.

The trial court entered judgment in favor of Barratt and against the plaintiffs on the causes of action asserted against Barratt, and dismissed Barratt from the action with prejudice.

Both parties filed timely notices of appeal.

11

III.

DISCUSSION

A.     *The plaintiffs' appeal*

    1.     *The trial court did not err in sustaining Barratt's demurrer to the 6AC without leave to amend*

        a.     *Legal standards*

We review de novo an order sustaining a demurrer to determine whether the complaint alleges facts sufficient to state a cause of action.  (*CPF Agency Corp. v. Sevel's 24 Hour Towing Service* (2005) 132 Cal.App.4th 1034, 1042.)  We exercise our independent judgment as to whether the complaint states a cause of action.  (*Palestini v. General Dynamics Corp.* (2002) 99 Cal.App.4th 80, 86.)  " 'A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground.' [Citation.]"  (*Gomes v. Countrywide Home Loans, Inc*. (2011) 192 Cal.App.4th 1149, 1153.)

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.  [Citations.]  The burden of proving such reasonable possibility is squarely on the plaintiff."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

12

b.      *Analysis*

i.      *The trial court did not err in sustaining Barratt's demurrer*

The causes of action alleged against Barratt are all based on claims for "fraud and deceit."  Specifically, the plaintiffs allege that Barratt is liable for (1) intentional misrepresentation, (2) "suppression of material facts," which we interpret to be a claim for "concealment," and (3) negligent misrepresentation.

To state a fraud cause of action, plaintiffs must allege (1) a misrepresentation (a false representation, concealment or nondisclosure)[10] as to a material fact; (2) knowledge of its falsity or scienter; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage.  (*Robinson Helicopter Co., Inc. v. Dana Corp*. (2004) 34 Cal.4th 979, 990.)  The essential elements of negligent misrepresentation are the same as the above, except that a cause of action for negligent misrepresentation does not require *knowledge of falsity* but instead, requires a *misrepresentation of fact by a person who has no reasonable grounds for believing it to be true*.  (Civ. Code, § 1710, subd. 2; *Gagne v. Bertran* (1954) 43 Cal.2d 481, 488; *West v. JPMorgan Chase Bank, N.A*. (2013) 214 Cal.App.4th 780, 792.)

---

[10]      Concealment is a species of fraud or deceit.  (See Civ. Code, §§ 1710, subd. (3), 1572, subd. 3; *Lovejoy v. AT&T Corp.* (2004) 119 Cal.App.4th 151, 158.)   The elements of a cause of action for concealment are substantially similar to the elements of a cause of action for making a false but affirmative representation: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp*. (1992) 6 Cal.App.4th 603, 612–613.)

13

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 (*Lazar*).) The heightened pleading standard for fraud requires " 'pleading *facts* [that] "show how, when, where, to whom, and by what means the representations were tendered." ' [Citation.]" (*Ibid.*) Further, " '[a] plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." ' " (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614, quoting *Lazar*, *supra*, at p. 645.) The normal policy of liberally construing pleadings against a demurrer will not be invoked to sustain a fraud cause of action that fails to set forth such specific allegations. (*Lazar*, *supra*, at p. 645.)

In addition, *every element* of a fraud cause of action must be specifically pleaded. (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807 (*Service by Medallion*); *Tarmann v. State Farm Mut. Auto. Ins. Co*. (1991) 2 Cal.App.4th 153, 157.) This pleading requirement of specificity applies not only to the alleged misrepresentation (or material omission), but also to the elements of causation and damage. "In order to recover for fraud, as in any other tort, the plaintiff must plead and prove the 'detriment proximately caused' by the defendant's tortious conduct. (Civ. Code, § 3333.) . . . 'Whatever form it takes, the injury or damage must not only be distinctly alleged but its

14

causal connection with the reliance on the representations must be shown.' [Citation.]" (*Service by Medallion*, *supra*, at p. 1818.)

The plaintiffs' fraud and deceit causes of action against Barratt are based on allegations that Barratt was involved in a conspiracy to conceal from plaintiffs the existence of construction defects in the Seahaus project. However, the plaintiffs' causes of action for fraud and deceit against Barratt are deficient in a number of respects. In order to better explain these deficiencies, we provide, verbatim, some of the allegations from the 6AC.

In the portion of the 6AC in which the plaintiffs attempt to describe the defendants, the plaintiffs allege the following:

> "57. British Barratt Developments PLC used its control of Barratt American to carry out its plan to withdraw and divert $23 million from the Seahaus La Jolla Guaranty Bank construction loan. British Barratt Develop[ments] PLC organized this plan so that Seahaus La Jolla purchasers would reimburse Guaranty Bank for the $23 million British Barratt Developments PLC planned to and did remove from the Guaranty Bank construction loan.
>
> "58. While the Seahaus La Jolla project and Barratt American were under British Barratt Developments PLC's control, agents of Barratt American—as alleged in detail in this operative complaint—were made aware of the significant and detailed construction defects, shoddy workmanship and deficiencies in the construction of the Seahau[s] La Jolla project. This shoddy work was performed at the Seahaus La Jolla project while British Barratt Developments PLC was still in control of Barratt American.
>
> "59. The $23 million that British Barratt Developments PLC withdrew and diverted from the Guaranty construction loan for the Seahaus La Jolla project should have been used to make repairs needed to correct the construction deficiencies and shoddy work

done at the project, which British Barratt Developments PLC knew that by its removal and diversion of the $23 million, the money needed for repairs would not be feasible."

While the 6AC alleges that Barratt and/or Barratt American were aware of "significant and detailed construction defects, shoddy workmanship and deficiencies in the construction" during the time Barratt still owned Barratt American, it does not state when the alleged defective construction occurred, or when, prior to the filing of the lawsuit, Barratt or Barratt American were made aware of the defects. Further, the 6AC fails to identify any misrepresentations and/or omissions that either Barratt or Barratt American made to conceal the alleged defects. In fact, the 6AC appears to suggest that very little, if any, of the actual construction was completed prior to the time that Barratt divested itself of its ownership of Barratt American, and further suggests that the real problems occurred, and were hidden from potential purchasers, *in 2005*.

For example, elsewhere in the 6AC, the plaintiffs allege that "[n]one of the 138 condominiums in the Seahaus La Jolla project had been built as of 13 April 2004." In fact, according to the 6AC, "the construction plans for the project were not approved and building permits were not issued until 9 April 2004." In Paragraph 120, the first paragraph under the subheading titled "THE CONSPIRACY," the plaintiffs allege:

> "*In and about March 2005*, for the purpose of closing the Seahaus sales escrows and consummating sales of the Seahaus units to generate funds for themselves, defendants Webcor, th[r]ough Ken Summers (Senior Project Manager) and Jeremy Bishop (Project Engineer); CLB through Luke Daniels, Seth Rhea, and Hal Adams; M.W. Steele through Mark Steele and Andrew Duncan; D'Amato Conversano through Robert Heeringa, Richard Hemmen, Diana

16

Earnest; and Weyerhaeuser through Terry K. Metzker, Curt Nieman, Jim Nicodemus, and Tuong Banh, knowingly and willfully conspired and agreed to misrepresent and suppress facts needed to make those stated not misleading with the purpose of closing the escrows and consummating sales on for [*sic*] the Seahaus project." (*Italics added.*)

Notably, this paragraph identifies the date of commencement of the alleged "conspiracy" as March 2005, and does not include Barratt or any of Barratt's representatives in the allegation. However, in the paragraph that immediately follows, Paragraph 121, the plaintiffs allege the following:

"The principles of Barratt American and British Barratt Developments PLC agreed amongst themselves for their own personal benefit and profit to conceal the defects and shoddy construction practices used to build the Seahaus La Jolla project. This agreement was made and carried out before the sale of British Barratt Developments PLC's interest in Barratt American was closed. British Barratt Developments PLC used its control of Barratt American and the Seahaus La Jolla project to obtain and divert $23 million from the Seahaus La Jolla construction loan with Guaranty Bank. Agents of British Barratt Development and Barratt American, as alleged herein, used false and inflated equity in the Seahaus La Jolla project based on inflated prices supported by the false statements and omission that concealed the shoddy construction practices and defects at the Seahaus La Jolla project."

Paragraphs 131 through 137 detail specifics about the alleged misrepresentations and omissions, which, notably, are alleged to have occurred *during and after* March 2005. Significantly, there are no allegations of any *specific* misrepresentations or material omissions made by either Barratt or Barratt American during the time period that Barratt still retained an interest in Barratt American.

17

Paragraph 160 of the 6AC alleges that only certain defendants (Webcor, CLB, M.W. Steele, and DCI) were involved in preparing the site for inspection, and that these four defendants suppressed the alleged defects and deviations from the approved plans. It also demonstrates that this conduct is alleged to have occurred no earlier than April 2005. Other "overt acts" that the "[d]efendants" are alleged to have taken "in furtherance of the conspiracy to defraud the plaintiffs" as identified in Paragraph 161 begin, at the earliest, in March 2005.

Section "VI." of the 6AC, titled "MISREPRESENTATIONS AND SUPPRESSED FACTS," begins with the allegation in Paragraph 172 that "[i]n and about March 2005, the following defendants made the following material misrepresentations, and suppressed the following material facts, in furtherance of the conspiracy to defraud plaintiffs . . . ." This statement is followed by a chart with a list of specific alleged misrepresentations and/or suppressed facts. Beyond the allegation that these misrepresentations and/or suppressed facts occurred "[i]n and about March 2005"—i.e., long after Barratt was no longer involved in the project and no longer had any interest in Barratt American—there is no reference to Barratt, or, for that matter, to Barratt American.[11]

_____

[11] There is a single allegation of a misrepresentation/omission made prior to March 2005 in the table, i.e., that in March 2004, at a " 'Meet the Architect' Night," Mark Steele, the project architect, essentially "assur[ed]" the audience that Seahaus "was a high-quality project that was being looked after carefully by a dedicated construction team of expert engineers, builders, and contractors." The 6AC alleges that Steele's comments were false because he "did not correct the representations or provide the after acquired information he discovered to plaintiffs that there were material defects embedded in the Seahaus project, that there were material deviations from the approved plans and that the City had

18

In the paragraphs set out under the headings for each relevant cause of action pertaining to defendant Barratt (i.e., the first through third causes of actions), the plaintiffs do not set out any specifics regarding the misrepresentations and/or omissions that they attribute to Barratt. Instead, the plaintiffs make allegations such as the following:

> "Defendants, in their individual or entity capacity, and/or as part of a conspiracy, made misrepresentations by making false representations as to the Seahaus La Jolla condominiums and common areas with knowledge of the falsity, with the intent to defraud Plaintiffs and to induce their reliance, such reliance which was justified and that harmed Plaintiffs."

The plaintiffs' claims in the second cause of action ("Fraud and Deceit: Suppression of Material Facts") contain slightly more specific allegations, such as:

> "The facts that Defendants intentionally concealed and failed to disclose involved the substandard construction, materials, installation, sound attenuation issues, and further included but were not limited to the fact that a materially significant number of PSL Parallam beams used to frame the Seahaus La Jolla buildings had been exposed to moisture levels exceeding applicable [*sic*] those permitted by applicable standards."

With respect to the third cause of action ("Fraud and Deceit: Negligent Misrepresentation of Fact Against Defendants"), the plaintiffs alleged in part:

> "237. Defendants or their agents, officers, or employees represented that no escrow would close until all Seahaus La Jolla association

---

not issued a Certificate of Occupancy." Inherent in this allegation is that the falsity of Steele's statements became apparent and/or required correction only *after* the project was being built, allegedly with shoddy workmanship and material deviations from the plans. However, Barratt was not involved with the project during the majority of the construction.

19

property and common area improvements, amenities, facilities and residential structures in the respective phase had been completed and a notice of completion had been filed.

"238. Defendants or their agents, officers, or employees presented Plaintiffs with the REAL ESTATE TRANSFER DISCLOSURE STATEMENT and a PUBLIC REPORT that did not disclose the construction and product defects as set forth in this complaint, including but not limited to, that a materially significant number of PSL Parallam beams used to frame the Seahaus La Jolla buildings had been exposed to moisture levels exceeding those permitted by applicable standards."

The allegations regarding the misrepresentations and omissions involved problems that plaintiffs claim occurred *during* the construction of the condominium buildings. For example, the plaintiffs' theory of liability as to Barratt appears to be the following: "Agents of British Barratt Development and Barratt American, as alleged herein, used false and inflated equity in the Seahaus La Jolla project based on inflated prices supported by the false statements and omissions that concealed the shoddy construction practices and defects at the Seahaus La Jolla project." In other words, the plaintiffs allege that Barratt was somehow involved in making false statements and omissions regarding defective construction. However, the 6AC does not identify what false statements or material omissions the plaintiffs are alleging that Barratt, or Barratt American, made during the time Barratt still owned Barratt American. Rather, the 6AC relies on general, conclusory allegations such as the following:

"While British Barratt Developments PLC had control of the Seahaus La Jolla project, British Barratt Developments PLC and Barratt American omitted material facts and made false statements that hid the faulty construction practices and defects at the Seahaus

20

La Jolla project. The false and fraudulent omissions and misstatements were made in sales documents and the Public Report used to sell units in the La Jolla Seahaus project while the project and marketing of the project were under the control of British Barratt Developments PLC. Purchasers were induced to purchase and did purchase units in the project based on false statements and omissions of material facts."

Nowhere does the 6AC identify what specific false statements or material omissions anyone at Barratt or Barratt American made, who made them, or when such alleged conduct occurred.[12]

Further, it does not appear from the allegations of the 6AC that Barratt was involved in the project during the time that most of the construction occurred, or specifically, when the alleged defective construction is said to have occurred. Again, as the trial court noted, the 6AC alleges only in a conclusory manner that Barratt made misrepresentations and/or omissions and concealed defects prior to August 2004, and the 6AC also alleges more specifically, and repeatedly, that the actual fraudulent conduct began *in March 2005*. There is a total failure to plead with any specificity at all—despite the overall specificity of the 6AC with respect to many of the other defendants and their conduct—any facts that would suggest that Barratt had knowledge of the alleged construction defects or that it was at all involved in any concealment of the construction defects prior to August 2004.

---

[12] Although the 6AC includes allegations regarding $23 million that Barratt allegedly withdrew from the construction loan proceeds as part of its sale of Barratt American, the 6AC does not indicate how Barratt's conduct in this regard, even if true, could form the basis of liability to the plaintiffs.

21

One may reasonably infer from the belated identification and addition of Barratt to this lawsuit that the plaintiffs decided to add Barratt as a defendant only after they had solidified their theory of the case, and after they had already alleged as to the other defendants that the plan to misrepresent the true nature of the construction project and omit information about construction defects occurred in March 2005 and later. Essentially, the gist of the allegations in the operative complaint is that a group of defendants who were responsible for developing and marketing the Seahaus condominium project sold condominiums that suffer from construction defects that resulted from defective construction practices and the installation of defective components—i.e., problems that arose *during construction* of the project. According to the plaintiffs, these defects rendered their condominiums less valuable than they would have been absent the defects. Plaintiffs allege that certain defendants, who plaintiffs claim knew about the defective practices and defective components at the time the practices occurred and/or the components were installed, failed to inform the condominium purchasers of the defects. However, the allegations in the earlier iterations of the 6AC tend to contradict the more recently added allegations regarding Barratt. These contradictory and general allegations are insufficient to state a claim against Barratt.

Plaintiffs " ' "may not discard factual allegations of a prior complaint , or avoid them by contradictory averments, in a superseding, amended pleading," [citation]' [citation]" and "must explain inconsistencies between the prior and proposed pleadings."

22

(*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 653;

*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 12 [where a party amends a verified pleading to

avoid the effect of a damaging factual allegation, a court may disregard new inconsistent

allegations].)   These principles clearly apply to inconsistent facts alleged *within the same

pleading,* as well.   (*Reichert v. General Ins. Co*. (1968) 68 Cal.2d 822, 836.)   "A plaintiff

may plead inconsistent counts or causes of action in a verified complaint, but this rule

does not entitle a party to describe the same transaction as including contradictory or

antagonistic facts."   (*Alfaro v. Community Housing Improvement System & Planning

Assn., Inc*. (2009) 171 Cal.App.4th 1356, 1381; *Beatty v. Pacific States Sav. & Loan Co*.

(1935) 4 Cal.App.2d 692, 697 [the rules of pleading do "not permit the pleader to blow

both hot and cold in the same complaint on the subject of facts of which he purports to

speak with knowledge under oath"].)

Plaintiffs' allegations in the 6AC regarding the time period during which they

claim Barratt participated in the fraud specifically conflict with other allegations in the

6AC regarding the misrepresentations and omissions that the plaintiffs allege were made

by the other named defendants, such as Webcor, CLB, M.W. Steele, and DCI, concerning

the construction defects.  In addition, the allegations regarding Barratt's role in the

misrepresentations and/or omissions are conclusory and lacking in any detail.  There are

simply no specific allegations as to any misrepresentations or omissions made by Barratt.

Rather, the *only* specific misrepresentations and omissions in the complaint are alleged to

have been made by other defendants.  Further, there are no allegations that would indicate

23

that Barratt played any part in a "conspiracy" to defraud the plaintiffs. The conclusory allegations in the 6AC with respect to Barratt are fatally defective. The trial court therefore did not err in sustaining Barratt's demurrer.

ii. *Plaintiffs have not shown that the trial court abused its discretion in denying leave to amend*

We next consider whether the trial court abused its discretion in sustaining Barratt's demurrer without leave to amend. As stated previously, the burden is on the plaintiff to establish that there is a reasonable possibility that the identified defects in the pleading can be cured by amendment. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) " '[A p]laintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.]" (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) A plaintiff may meet this burden on appeal. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

Apparently believing that the operative pleading does not suffer from any defects, the plaintiffs do not attempt to demonstrate how they could amend the 6AC to state a viable claim against Barratt. Plaintiffs have thus failed to meet their burden to prove that there is a reasonable possibility that the defects can be cured. We therefore affirm the trial court's sustaining of the demurrer without leave to amend.

24

2. *The trial court did not abuse its discretion in denying relief under section 473, subdivision (b)*

The plaintiffs contend that the trial court erred in denying them mandatory relief from the order in which the court sustained Barratt's demurrer without leave to amend (and the resulting dismissal), based on counsel's declaration of fault.

Plaintiffs' counsel attested that it was her fault that she failed to appear at the correct time for the oral argument on the motion. Specifically, counsel attested, by way of a declaration:

> "Oral argument on the hearing was originally scheduled for November 16, 2012 at 10:30 a.m. Because Plaintiffs' counsel had a conflict with a class certification motion hearing in another department, the Court reset the oral argument for 26 November 2012, changing the time to 9:00 a.m. Inadvertently, my secretary calendared the date change but not the time change of the argument.
>
> "[¶] . . . [¶]
>
> "The hearing was not attended due to counsel's mistake, inadvertence or neglect. It was my office's intention, and remains my office's request, to attend a hearing on the demurrer, argue the merits of the demurrer opposition, and present facts that could cure any perceived deficiencies."

The plaintiffs suggest that this situation "call[s] for mandatory relief" under section 473, subdivision (b). They argue, "Mistakes of counsel that lead to dismissal of actions can qualify for mandatory relief from a judgment."

Section 473, subdivision (b), on which the plaintiffs rely, provides in relevant part:

> "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake,

25

inadvertence, surprise, or excusable neglect. Application for this relief shall be accompanied by a copy of the answer or other pleading proposed to be filed therein, otherwise the application shall not be granted, and shall be made within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken. . . . Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, or (2) resulting default judgment or dismissal entered against his or her client, unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect. The court shall, whenever relief is granted based on an attorney's affidavit of fault, direct the attorney to pay reasonable compensatory legal fees and costs to opposing counsel or parties. However, this section shall not lengthen the time within which an action shall be brought to trial pursuant to Section 583.310."

As this provision makes clear, section 473, subdivision (b) provides for both discretionary and mandatory relief. The mandatory relief provision requires the trial court to vacate any "default entered by the clerk against [a] client, and which will result in entry of a default judgment," or any "default judgment or dismissal entered against [a] client" in situations in which an attorney attests that his or her "mistake, inadvertence, surprise, or neglect" resulted in the default, default judgment, or dismissal at issue.

Despite counsel's acknowledgement of fault, we conclude that the mandatory relief portion of section 473, subdivision (b) does not apply to this situation. By its terms, section 473, subdivision (b) requires that a court vacate only a "default," "default judgment," or "dismissal." Although "[t]he range of attorney conduct for which relief

26

can be granted in the mandatory provision is broader than that in the discretionary provision, and includes inexcusable neglect," the "range of adverse litigation results from which relief can be granted is narrower." (*Leader v. Health Industries of America, Inc*. (2001) 89 Cal.App.4th 603, 616 (*Leader*).) "Mandatory relief only extends to *vacating* a default which will result in the entry of a default judgment, a default judgment, or an *entered* dismissal." (*Ibid*.)

" ' "There is no evidence the amendment was intended to be a catch-all remedy for every case of poor judgment on the part of counsel which results in a dismissal." [Citation.]' [Citation.] Courts have therefore interpreted the mandatory relief provision concerning dismissals so as to harmonize its stated goal (giving dismissed plaintiffs comparable relief to that afforded to defaulted defendants) with the statutes which authorize dismissal: 'The relevant provision of section 473 may be reconciled with the discretionary dismissal statutes only if limited to those dismissals which are the procedural equivalent of defaults—i.e., those which occur because the plaintiff's attorney has failed to oppose a dismissal motion.' [Citations.]" (*Leader*, *supra*, 89 Cal.App.4th at p. 618, italics omitted.) " '[A] plaintiff may obtain mandatory relief under section 473 from a dismissal entered under the discretionary dismissal statutes (§ 583.410 et seq.) only if it occurred because the plaintiff's attorney failed to oppose the defendant's motion for dismissal; the plaintiff may not obtain mandatory relief merely by filing an affidavit in which his or her counsel avows that the dismissal came about through counsel's fault.'

27

[Citation.]" (*Id.* at pp. 618-619.)[13]  In other words, " 'when the Legislature incorporated dismissals into section 473, it intended to reach only those dismissals which occur through failure to oppose a dismissal motion—the only dismissals which are procedurally equivalent to a default.' [Citation.]" (*English v. Ikon Business Solutions* (2001) 94 Cal.App.4th 130, 141.)

In this case, the plaintiffs' attorney did not fail to oppose the demurrer, and the dismissal was not procedurally equivalent to a default.  Although counsel failed to appear for oral argument on the demurrer, the court had the benefit of counsel's arguments from the opposition papers that plaintiffs' counsel had filed.  The trial court did not dismiss

---

13     The court in *Generale Bank Nederland v. Eyes of the Beholder Ltd.* (1998) 61 Cal.App.4th 1384, 1396, summarized the development of the statute with respect to the addition of dismissals, in addition to defaults:  " 'Enacted in 1988, the attorney affidavit provision of section 473 originally applied only to defaults. Its purpose was "to relieve the innocent client of the burden of the attorney's fault, to impose the burden on the erring attorney, and to avoid precipitating more litigation in the form of malpractice suits." [Citation.]  In the words of the author, " 'Clients who have  done nothing wrong are often denied the opportunity to defend themselves, simply because of the mistake or inadvertence of their attorneys in meeting filing  deadlines.' " [Citation.]' [Citation.] [¶] 'In 1992, the attorney affidavit provision was extended to provide mandatory relief from dismissals as well as defaults.  The change was considered to be among the " 'noncontroversial proposals . . .' " contained in an omnibus civil practice bill.  The State Bar, which sponsored the amendment, argued that " 'it is illogical and arbitrary to allow mandatory relief for defendants when a default judgment has been entered . . . and not to provide comparable relief to plaintiffs whose cases are dismissed for the same reason.' " [Citation.] [¶] Although the statute on its face affords relief from unspecified "dismissal" caused by attorney neglect, our courts have, through judicial construction, prevented it from being used indiscriminately by plaintiffs' attorneys as a "perfect escape hatch" [citation] to undo dismissals of civil cases.  Thus it has been held that the provision does not apply to dismissals under section 583.410 for delay in prosecution of the action because virtually all such dismissals are attorney caused and such a construction would result in a disfavored repeal of the discretionary dismissal statute by implication. . . . ' [Citation.]" (*Ibid.*, italics omitted.)

28

this lawsuit as to Barratt because there was no opposition to Barratt's demurrer. Rather, the court dismissed the lawsuit as to Barratt only after considering the merits of the motion and concluding that Barratt had established that the plaintiffs' operative complaint was deficient as to Barratt, and concluding that the plaintiffs had not demonstrated how they could remedy deficiencies.[14] Mandatory relief under section 473, subdivision (b) is not available in this circumstance.

Under the discretionary relief provision of section 473, subdivision (b), a court may "relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." The statute specifies that the court "may" grant relief "upon any terms as may be just." The plaintiffs focus on the mandatory relief provision of section 473, subdivision (b), and do not even argue that the failure to attend a demurrer hearing constitutes excusable neglect for which discretionary relief may be granted. Nevertheless, we have considered the issue and conclude that the trial court did not abuse its discretion in denying the plaintiffs' request for discretionary relief from judgment.

As the party moving under section 473, subdivision (b), appellants had the burden of establishing entitlement to relief from the judgment. (*Parage v. Couedel* (1997) 60 Cal.App.4th 1037, 1041.) Where " 'a party fails to show that a judgment has been taken

---

[14]    The plaintiffs assert that "the attorney's mistake in calendaring the hour for the oral argument should not cause Appellants to lose their day in court and deprive them of an opportunity for the merits of the case to be reached." However, the plaintiffs did not "lose their day in court." In fact, plaintiffs participated in full briefing of the issues that the court ultimately decided *on the merits*.

against him through his mistake, inadvertence, surprise or excusable neglect the court may not grant relief. It has no discretion.' [Citation.]" (*Id.* at p. 1042.) To warrant discretionary relief, the proffered evidence must show that the attorney's error was excusable. (See *Zamora v. Clayborn Contracting Group, Inc*. (2002) 28 Cal.4th 249, 258; *Solv-All v. Superior Court* (2005) 131 Cal.App.4th 1003, 1007.) Neglect is excusable only if a reasonably prudent person in similar circumstances might have made the same error. (*Bettencourt v. Los Rios Community College Dist.* (1986) 42 Cal.3d 270, 276 (*Bettencourt*).) Relevant factors in assessing counsel error include: "(1) the nature of the mistake or neglect; and (2) whether counsel was otherwise diligent in investigating and pursuing the claim." (*Ibid.*) "Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable." (*Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 682.) "To hold otherwise would be to eliminate the express statutory requirement of excusability and effectively eviscerate the concept of attorney malpractice." (*Ibid*.)

The scheduling problem that occurred in this case does not constitute "excusable neglect," and counsel's failure to appear at the oral argument was not the cause of the dismissal. The trial court could therefore reasonably have denied discretionary relief.[15]

---

[15] "The only occasion for the application of section 473 is where a party is unexpectedly placed in a situation to his injury *without fault or negligence of his own* and against which ordinary prudence could not have guarded. Neither inadvertence nor neglect will warrant judicial relief unless it may reasonably be classified as of the excusable variety upon a sufficient showing." (*Elms v. Elms* (1946) 72 Cal.App.2d 508, 513, italics added.)

30

First, the statute grants the court authority to "relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding" that is "taken against him or her *through* his or her mistake, inadvertence, surprise, or excusable neglect." In other words, the mistake or excusable neglect must be the cause of the order taken against him or her. Plaintiffs contend that the fact that the trial court indicated in its tentative decision that it intended to overrule the demurrer demonstrates that plaintiffs' counsel's failure to appear at the hearing to orally oppose the demurrer was decisive. However, the 6AC was deficient as to Barratt, and oral argument could not have changed this basic fact. It is the deficiencies of the 6AC, and not the lack of oral argument opposing Barratt's demurrer, that led to the ultimate dismissal of Barratt from the lawsuit.

Further, counsel's failure to appear at the hearing on the demurrer does not constitute "excusable neglect." Plaintiffs' counsel had sufficient notice of the hearing date and time, and had indicated to the court that counsel had received notice. Specifically, the date and time were provided to counsel at an ex parte hearing initiated by plaintiffs' counsel In addition, plaintiffs' papers filed in opposition to the demurrer noted the correct hearing date and time in the caption, and the tentative ruling regarding the demurrer noted the correct date and time of the hearing. In view of these facts, a reasonably prudent person would have been unlikely to make the same error. Thus, the neglect was not excusable. (See *Bettencourt, supra,* 42 Cal.3d at p. 276.)

Even if the court were to have found that the counsel's conduct constituted "excusable neglect," section 473, subdivision (b)'s discretionary relief provision is, by its

31

terms, *discretionary*. Relief from the mistake or neglect is not an entitlement. Rather, a court "may" grant relief where the court deems it "just" to do so. The trial court could have reasonably determined that regardless of whether there had been "excusable neglect" in the plaintiffs' counsel failing to appear for the oral argument, granting relief from the dismissal in this situation would be futile given that the court had already concluded, *on the merits*, that the plaintiffs had failed to assert a valid cause of action against Barratt. In other words, the trial court could have concluded that nothing that counsel might have said during oral argument would have affected the court's ultimate determination.

We conclude that the trial court did not err in denying the plaintiffs mandatory and/or discretionary relief from the order sustaining Barratt's demurrer without leave to amend and the resulting dismissal.

B.      *Barratt's cross-appeal*

    1.      *The trial court did not abuse its discretion in denying Barratt's request for sanctions*

Barratt contends that it is entitled to be reimbursed for the attorney fees that it incurred in opposing the plaintiffs' motion for reconsideration, as sanctions for the frivolous motion, and argues that the trial court abused its discretion in denying those requested fees "without explanation." According to Barratt, the plaintiffs' motion was improper, in that the plaintiffs presented no new law, circumstances, or facts in seeking reconsideration pursuant to section 1008.

32

Subdivision (a) of section 1008 provides:

"When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown."

Barratt contends that the failure of plaintiffs' counsel to appear for oral argument, and plaintiffs' counsel's request for an opportunity to present oral argument on the matter, does not constitute a new or different fact or circumstance sufficient to meet the requirements of section 1008. Barratt further contends that based on subdivision (d) of that provision, the plaintiffs' failure to present new or different facts, circumstances or law in making the motion for reconsideration entitles Barratt "to its fees in defending against Appellants' objectively noncompliant reconsideration motion."

Subdivision (d) of section 1008 provides: "A violation of this section may be punished as a contempt and with sanctions as allowed by Section 128.7. In addition, an order made contrary to this section may be revoked by the judge or commissioner who made it, or vacated by a judge of the court in which the action or proceeding is pending."[16] It is clear from the language of the provision on which Barratt relies that it

16      Section 128.7, in turn, provides in relevant part:

33

"(a) Every pleading, petition, written notice of motion, or other similar paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party. Each paper shall state the signer's address and telephone number, if any. Except when otherwise provided by law, pleadings need not be verified or accompanied by affidavit. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

"(b) By presenting to the court, whether by signing, filing, submitting, or later advocating, a pleading, petition, written notice of motion, or other similar paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, all of the following conditions are met:

"(1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

"(2) The claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

"(3) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

"(4) The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

"(c) If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation. In determining

is permissive, rather than mandatory.  In other words, subdivision (d) of section 1008 *authorizes* the trial court to punish a violation "as a contempt" and award sanctions; it does not, however, *require* that sanctions be imposed, nor does it entitle the party opposing the motion to its attorney fees as sanctions.

Barratt cites *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 847 *(Henneberque)* for the proposition that "[a] trial court abuses its discretion in denying attorneys' fees when 'the record discloses no reasonable basis for denying' a request for attorneys' fees."  What Barratt fails to acknowledge is that *Henneberque* involved a request for attorney fees pursuant to a motion for an award of attorney fees under section 1021.5.  That statute provides:

---

what sanctions, if any, should be ordered, the court shall consider whether a party seeking sanctions has exercised due diligence.

"[¶] . . . [¶]

"(d) A sanction imposed for violation of subdivision (b) shall be limited to what is sufficient to deter repetition of this conduct or comparable conduct by others similarly situated.  Subject to the limitations in paragraphs (1) and (2), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorney's fees and other expenses incurred as a direct result of the violation.

"[¶] . . . [¶]

"(e) When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this section and explain the basis for the sanction imposed."

35

"Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor . . . ."

In holding that the trial court had abused its discretion in failing to award the prevailing plaintiff his attorney fees in that case, the appellate court concluded, "[T]he financial burden which this suit placed on [the plaintiff] was out of proportion to his personal stake in the case," and the plaintiff's attorney fees " 'should not in the interest of justice be paid out of [his] recovery.' " (*Henneberque*, *supra*, 172 Cal.App.3d at p. 847.) *Henneberque* thus does not stand for the broad proposition for which Barratt cites it. Unlike section 1021.5, which provides multiple factors for the trial court to consider, section 1008, subdivision (d) merely grants the trial court discretionary authority to punish a violation of section 1008 as "a contempt and with sanctions." The statute does not entitle a party to demand that a trial court punish every technical violation of section 1008 "as a contempt" and impose sanctions. Rather, the statute *permits* the court to do so, in its discretion.

Seemingly aware that it is not truly "entitled" to its fees pursuant to section 1008, subdivision (d), Barratt next posits that the trial court's error was not simply in denying Barratt's request for fees as a sanction, but in denying that request "without explanation."

36

Barratt provides no authority for its contention that the trial court must provide the reasons underlying its exercise of discretion not to impose sanctions, and the text of section 128.7, specifically referenced in section 1008, subdivision (d), suggests that the court is not required to do so. In particular, subdivision (e) of section 128.7 specifies, in relevant part: "*When imposing sanctions*, the court shall describe the conduct determined to constitute a violation of this section and explain the basis for the sanction imposed." (Italics added.) The statute requires the court to provide its reasoning and findings only in the situation in which it decides to impose sanctions, not when it declines to do so. Given this, we have no basis to conclude that the trial court abused its discretion in declining to impose the sanctions that Barratt requested simply because the court did so without explanation.

IV.

DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

_____

AARON, J.

WE CONCUR:

_____

McCONNELL, P. J.

_____

HALLER, J.

37